*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-AA-52

JENINE EVANS, PETITIONER,

V.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, RESPONDENT,

and

COMMUNITY PARTNERSHIP FOR PREVENTION OF HOMELESSNESS, INTERVENOR.

On Petition for Review of an Order of
the Office of Administrative Hearings
(DOES-2226-18)

(Submitted January 3, 2020              Decided August 6, 2020)

Jenine Evans, *pro se.*

*O'Neil S. King* was on the brief for appellee.

Before THOMPSON and MCLEESE, *Associate Judges*, and NEBEKER, *Senior Judge*.

Opinion for the court by *Associate Judge* THOMPSON.

Dissenting opinion by *Associate Judge* MCLEESE at page 11.

THOMPSON, *Associate Judge*: *Pro se* petitioner, Jenine Evans, seeks review of a decision of the Office of Administrative Hearings ("OAH") affirming a determination of the District of Columbia Department of Employment Services

("DOES") disqualifying her from receiving unemployment insurance benefits. Ms. Evans, who also proceeded *pro se* before the OAH, acknowledges that she voluntarily quit her position with intervenor Community Partnership for Prevention of Homelessness ("CPPH"), but contends that the Administrative Law Judge ("ALJ") erred in finding that she did so without good cause connected with the work. Concluding that the ALJ's conclusion does not flow rationally from the findings of fact, we reverse.

**I.**

Ms. Evans was employed for about a year and a half by the CPPH as a shift manager at a homeless shelter. Ms. Evans resigned on September 27, 2018, to accept another job. However, about a month after starting the new job, Ms. Evans was terminated (on the ground that she was not sufficiently interactive with the autistic child with whom she worked in that job). She applied for unemployment insurance benefits, but her claim was denied on the ground that she voluntarily left her job with CPPH without good cause connected with the work. Ms. Evans appealed to OAH, which held a hearing on January 8, 2019.

At the hearing, Ms. Evans testified that she voluntarily quit her job with CPPH after finding another job because she had learned that CPPH would be "closing down" the shelter where she worked. She testified that no one at CPPH had told her that she was "going to be let go[,]" but explained that "[n]o one told us anything, I wasn't told anything." She further testified that by the time she actually quit, the two floors on which she worked "were already closed down." She testified that at a staff meeting, "it was said that no questions should be asked about the building shutdown[,]" so that was when she started applying for other jobs. After she was let go from the new job, she called the CPPH Human Resources office to ask whether she could return to CPPH, but received no response.

In his testimony at the hearing, Delano Hayles, CPPH's representative and one of petitioner's former supervisors, explained that CPPH had discharged seven employees on September 7 and informed other employees that CPPH "would let them know if they were being discharged once the time was appropriate." Mr. Hayles acknowledged that the CPPH homeless shelter where petitioner worked did close at the end of October.

The ALJ issued a final order on January 10, 2019. He found that "[d]uring September 2018, [CPPH] laid off seven employees in anticipation of its changing needs and the likely shutdown of the homeless shelter where [c]laimant worked." He further found that "[w]hile [c]laimant, and all of the employees at the shelter where [c]laimant worked were at risk of being laid off during the next several months, [CPPH] had not told [c]laimant that she was being laid off and [c]laimant was not under threat of imminent discharge." He further found that petitioner "resigned to accept another job in light of the lack of job security with . . . [e]mployer".

The ALJ acknowledged that petitioner "rightfully perceived that her position with [e]mployer was at some risk[,]" but relying on *Gomillion v. District of Columbia Dep't of Emp't Servs.*, 447 A.2d 449 (D.C. 1982), concluded that petitioner left her position with employer voluntarily, "and without good cause connected with the work." He therefore affirmed the claims examiner's determination that petitioner was "disqualified from receiving unemployment compensation benefits[.]" This petition for review followed.

**II.**

"[A]ny individual who left [her] most recent work voluntarily without good cause connected with the work, as determined under duly prescribed regulations, shall not be eligible for [unemployment insurance] benefits . . . ." D.C. Code § 51-110(a) (2014 Repl. & 2020 Supp.). "The test of voluntariness is whether it appears from all of the circumstances that an employee's departure was 'voluntary in fact, within the ordinary meaning of the word 'voluntary.''" *Cruz v. District of Columbia Dep't of Emp't Servs.*, 633 A.2d 66, 70 (D.C. 1993). "[A]n employee's resignation is 'voluntary' if it was based on [her] own volition, and not compelled by the employer." *Id.* The determination of "good cause connected with the work," D.C. Code § 51-110(a), "is factual in nature and should be judged by the standard of a reasonably prudent person [in the labor market] under similar circumstances." *Kramer v. District of Columbia Dep't of Emp't Servs.*, 447 A.2d 28, 30 (D.C. 1982). "In order to constitute good cause, the circumstances which compel the decision to leave employment must be real, not imaginary, substantial, not trifling, and reasonable, not whimsical; there must be some compulsion produced by extraneous and necessitous or compelling circumstances." *Cruz,* 633 A.2d at 72 (internal quotation marks omitted).

**III.**

CPPH urges us to uphold the ALJ's determination that petitioner's "deci[sion] to quit work in order to accept a new position with another company [was] a personal decision that [was] not related to the work the claimant was performing," thus disqualifying her from receiving unemployment insurance benefits.

As noted, the ALJ relied on this court's decision in *Gomillion*. The facts there were that the claimant left his old job to pursue another job with "the expectation of earning higher wages" at the new job. *Gomillion*, 447 A.2d at 451. Unlike in the present case, *Gomillion* did not involve a threat that the employee's current job would disappear. The instant case is more similar to *Cruz*, 633 A.2d 66, and to *Beynum v. Arch Training Ctr.*, 998 A.2d 316 (D.C. 2010).

In *Cruz*, we remanded the case to DOES for further proceedings on the following rationale:

> If Mr. Cruz had left UPO only because he had accepted a better offer, recovery would be foreclosed under our

> decision in *Gomillion*. . . . This case is unlike *Gomillion*, however, in that Mr. Cruz alleged that he voluntarily left UPO, at least in part, because UPO's financial instability seriously threatened his job security, . . . [a reason that] merit[s] scrutiny under the 'reasonable and prudent person' test . . . . [However, the] hearing examiner . . . made no attempt at the hearing to elicit facts relevant to the complainant's allegations as to the situation existing at UPO. We do not know if the employer was, in fact, in financial peril, or if Mr. Cruz reasonably believed that it was. . . . We do not suggest that an employee's concerns about possible discharge on account of his employer's actual or perceived financial straits, . . . would necessarily constitute "good cause connected with the work" within the meaning of the statute. . . . Nevertheless, given the points raised by Mr. Cruz, we cannot say that the hearing examiner made a finding on each relevant issue of fact, or that the agency's decision was based on substantial evidence in the record as a whole.

*Cruz,* 633 A.2d at 71-72. We also remarked that "the sufficiency of a claimant's asserted justifications must be considered in light of the remedial purposes of the statute." *Id.* at 71.

Similarly, in *Beynum*, we remanded for further proceedings because the ALJ should have been alert "to the possibility that petitioner's decision to leave Arch was motivated by the uncertain future of her position with Arch and her desire to seek improved job security in the marketplace." *Beynum*, 998 A.2d at 320. We reiterated our comment in *Cruz* that whether an unemployment insurance claimant

has sufficiently shown "good cause connected with the work" for voluntarily leaving her job is to be considered in light of the remedial and humanitarian purposes of the statute. *Id.* (internal quotation marks omitted).

The "'good cause connected with the work'" standard is not "an easy standard . . . to meet," *Cruz*, 633 A.2d at 72, but, as described above, in the instant case, the ALJ found that petitioner "rightfully perceived that her position with [e]mployer was at some risk[.]" The ALJ also found that CPPH "laid off seven employees in anticipation of its changing needs and the likely shutdown of the homeless shelter where [petitioner] worked." In addition, the ALJ heard petitioner's uncontradicted testimony that "[b]y the time [she] actually left[] [her] job with CPPH, her] two floors, 4 and 5, were already closed down." Mr. Hayles confirmed in his testimony that the shelter "closed at the end of October," just a few weeks after petitioner resigned. He gave no assurance that petitioner would have been moved to another position if she had remained in CPPH's employ, explaining that if petitioner had not quit, "and we needed that position, she would have been retained for one of our hotel sites." Further, petitioner testified that prior to her departure "no one was giving [employees] information of when [the shelter] was closing down or if anybody was getting moved to another site" and employees were told "that no questions should be asked about the building

shutdown." Mr. Hayles confirmed that employees were told that "we would let them know if they were being discharged once the time was appropriate" because there were still families in the shelter and CPPH "didn't want to cause all the employees to think that they're going to be discharged so everyone quits and then we have . . . no one to serve those families." And what petitioner described as HR's non-response to her inquiry about returning to CPPH after she lost her subsequent job (which supports an inference that no positions were available, or at least that none were being held for petitioner) indicates the reasonableness of petitioner's anticipation that her job was not secure. Finally, the evidence supported petitioner's testimony that she "didn't quit [CPPH] just not to have a job" — showing, we think, that this is not a case involving a claim that is contrary to the intent of the unemployment insurance statute to withhold payment from "'the shirker, the slothful or the indolent[.]'" *Cruz*, 633 A.2d at 69.

We conclude that the foregoing evidence taken together compelled the ALJ to conclude that, in voluntarily leaving her job at CPPH, petitioner behaved as a reasonably prudent person in the labor market would have behaved under similar circumstances. His conclusion that petitioner did not leave her job for good cause

connected with the work does not "flow rationally from [his] findings"[1] about petitioner's "rightful[] perce[ption]" that her job with CPPH was at risk or from the substantial evidence in the record supporting that finding. And while the ALJ emphasized that no one told petitioner that she faced imminent discharge, Mr. Hayles candidly acknowledged that CPPH intentionally withheld that lack-of-job-security information from employees to deter them from leaving for other jobs; in that circumstance, we conclude, the absence of notice of imminent discharge should not preclude qualification for benefits. For all these reasons, we are constrained to reverse the ALJ's decision.[2] *See Barnett v. District of Columbia*

---

[1] *Cruz*, 633 A.2d at 70 (internal quotation marks omitted).

[2] This case is different from *Cruz* and *Beynum*, in which we concluded that remands for further proceedings rather than full-stop reversals were in order. As we observed in *Beynum*, in *Cruz,* "the employee alleged that his employer was in a financial crisis, that employees had been furloughed, and that he believed that his position was at risk," but "the hearing officer did not address this allegation in her findings[.]" 998 A.2d at 320 (internal quotation marks and brackets omitted). That is, the ALJ had made no findings about whether "the employer was, in fact, in financial peril, or if Mr. Cruz reasonably believed that it was." 633 A.2d at 71-72. The *Cruz* court concluded that the employee was "entitled to have these issues adequately explored and then resolved by reasonably specific findings." 633 A.2d at 72.

Similarly, in *Beynum,* we said that while the employee's hearing testimony "lacked specificity," the claims examiner's original determination that the employee had been laid off for lack of work "should have alerted the ALJ to the possibility that [the employee's] decision to leave [her job] was motivated by the uncertain future of her position . . . and her desire to seek improved job security in the marketplace." 998 A.2d at 320. But the ALJ had "fail[ed] to consider the

(continued…)

*Dep't of Emp't Servs.*, 491 A.2d 1156, 1164 (D.C. 1985) (remanding to the agency "for the calculation and award of benefits to petitioner").

Wherefore, the order of the OAH disqualifying petitioner for benefits is

*Reversed.*

MCLEESE, *Associate Judge*, dissenting: I agree with the court that we should not affirm the order concluding that Ms. Evans is disqualified from receiving unemployment-compensation benefits. In my view, however, the court should remand the case, as this court did in both of the cases on which the court primarily

_____

(…continued)
employee's testimony that she quit to take another job after her employer's executive director expressed uncertainty about "what was going to happen" after a second session of the (under-enrolled) class the employee was teaching. *Id.* at 319.

Here, by contrast, the ALJ considered the relevant issue and made specific findings: that CPPH had laid off seven employees; that at the time petitioner resigned, the shelter where she worked was likely to shut down; that "all of the employees at the shelter where [petitioner] worked were at risk of being laid off"; that petitioner "rightfully perceived" that her job was in jeopardy; and that petitioner "resigned to accept another job in light of the lack of job security." Nevertheless, the ALJ concluded that petitioner did not leave her job for good cause connected with the work — a conclusion that we conclude is legally erroneous on this record.

relies: *Beynum v. Arch Training Ctr.*, 998 A.2d 316 (D.C. 2010), and *Cruz v. District of Columbia Dep't of Emp't Servs.*, 633 A.2d 66 (D.C. 1993). As in those cases, I think it would be preferable for the ALJ (a) to make additional findings on disputed and relevant circumstances, such as the precise nature of the discussions between Ms. Evans and her employer; and (b) to determine in the first instance whether, in light of those findings, Ms. Evans had good cause to quit, because she had sufficient reason to believe that she would imminently be laid off. I therefore respectfully dissent from the court's decision to reverse the order of the OAH outright.